15, 1939, Southwestern Management against Delmonico Backwards. I'm not going to say the word. Please. May it please the Court. I ask the Court to reinforce the, quote, policy of rewarding those who first seek federal registration, end quote, of their trademark. This Court's predecessor, the CCPA, announced this policy in its 1970 decision in Ray Batres Foods. That case also involved a concurrent use proceeding on appeal from the Trademark Trial and Appeal Board. The policy of rewarding those who first seek federal registration has been reaffirmed by the CCPA in the Winterking case in 1980, as well as by other district courts. Since 1970, Congress has amended the Lanham Act in ways that augment the policy. But how do you think the policy bears on whether the concurrent registration may be denied if there is a sufficient likelihood of confusion? I think in determining whether there is a likelihood of confusion, in the context of concurrent use proceeding, the courts have always indicated who was supposed to apply to register their trademark. That is one of the factors that is to be considered in connection with that likelihood of confusion analysis. Translate that into a rule. Does that mean that the Board here erred by placing the burden on the likelihood of confusion issue on the wrong party, or what exactly? No. The Board erred by basically disregarding that policy and giving essentially no weight to the important factor of Southwestern management's first and early application to seek registration of its trademark. It gave no weight to that. What I'm trying to understand is how that weight is to be implemented. Is it because that shifts the burden on likelihood of confusion? Is it because in considering whether there is a likelihood of confusion, a first applicant is less likely to generate confusion? It seems to me one needs to translate that into what exactly to do with likelihood of confusion. The case law to date has not said that the party who first seeks registration has a presumptive right to the nationwide protection for its trademark. The case law has not done that to date. Whether it should be that, should it be transformed to that by this court in this case today, I leave for the court's discretion. The presiding judge and you were exploring the possibility of a link between the fact that one is the first to apply and whether there's going to be a likelihood of confusion if the mark is granted, right? What I don't understand is why the first to apply is relevant at all to a likelihood of confusion. Give me a fact circumstance. The presiding judge suggested that well maybe the first person to apply maybe has some respect for the system or something and will maybe do things in such a way that there couldn't be confusion, which seems utterly far-fetched to me. Can you improve on them? I don't mean to criticize the presiding judge. Can you improve on that? Give me a hypothetical where the fact that someone was the first to apply tells you anything about whether there would or would not be a likelihood of confusion. All right. Please. All right. I'll do my best. If one applies for a federal registration in the current scheme of things, especially on an actual use basis, and the registration issues, then the effective date of nationwide constructive notice and use is retroactive back to the date of the application. All right? Now let's say that later on some parties then move to cancel the registration as concurrent users. Well, the nationwide constructive use went back to the date of the application. So presumptively, the applicant would have had nationwide notice and use as of the date of this application if the registration had issued. Had the right, but may not have done it. Well, that's… It may not have been in the actual nationwide use. You had this presumptive right to it that you didn't do anything about. Well, the statute says that it is constructive nationwide notice and use. It is as though… You're going from something that's constructive to something that's actual. The likelihood of confusion is actual. We're looking for a likelihood of actual, not hypothetical, confusion. Right? Isn't that the nature when you're talking about likelihood of confusion? When we're saying, well, there's likely to be confusion in a murk? And we're trying to minimize or eliminate the likelihood of confusion by segregating the registration rights among the parties, respective parties, to various geographic territories or other restrictions so as to minimize that likelihood of confusion. And one of the factors to consider is if you were first to apply and you obtained your registration, your nationwide constructive notice and use would have been throughout the United States going back to the date of your application. Here, that was 2003. Can I ask? I know that you are appealing the rejection of the current use registration application, which covers the whole country with a certain number of islands taken out. Given the board's opinion here, what room do you think there is for a more geographically limited application you might file? Or do you think that you just can't file one? Because the board, if I remember right, at the end of the opinion said, put in some words to say, we're just ruling on the one that we have in front of us and maybe something narrower would be permissible. That's a great question. I think there is room from a southwestern standpoint to modify the 40-mile radius and things like that. That's not sacrosanct at all. Probably not 45 miles. That probably wouldn't change things. But the board gave us no guidance at all as to what it considered to be the respective geographic rights of the parties or any indication of what it thought might be appropriate other limitations on the parties' uses of their trademarks that might elicit confusion. So we have no guidance on that from the board. And yet there is a statutory mandate that the board shall determine the respective rights to registration of the parties. So we are a bit in the dark. And I'm not sure how the board would go about that except maybe to have a behind-the-scenes discussion with the parties or to just flat-out come through with a ruling saying, to the effect, I know that this registration has requested this 40-mile radius around these three cities. However, we deem the proper scope of the concurrent use application should be this. And then just come out with an order and a ruling to the effect of what they think should be the proper scope of any limitations geographically or otherwise. So what do you think should have been the progression of the legal framework on the facts of this case that the board should have used? I guess, for example, is part of your argument that they shouldn't have engaged in the likelihood of confusion inquiry? Well, the likelihood of confusion analysis under the DuPont factors should never have been used. Because those factors always gravitate towards a finding of a likelihood of confusion in a concurrent use situation. Always. And if there were no likelihood of confusion, there would be no need for a concurrent use application. There's no likelihood of confusion. So if you look at some of the DuPont factors, such as the similarity of the marks in sight, sound, and meaning, the similarity of the goods and services in connection with the parties' use of the respective marks, the similarity of the channels of distribution that the parties use for their trademarked goods or services, any instances of likelihood of confusion, and so forth. The first several factors are a given. Yes, the marks are very, very similar. Yes, the goods and services are extremely similar. Is that necessarily the case in every concurrent use case? I mean, this is concurrent use is new to me, and I sort of look at it as a relic from 100 years ago. But given the situation we have here, it's not always the case in one of these concurrent use proceedings. Is it that we're dealing with identical marks for identical services? I'm not saying identical marks for identical services in all concurrent use situations, but they are so extremely similar in the marks, so extremely similar in the goods and services, so extremely similar in the channels of trade and distribution, that that's why we have these concurrent use situations. If they weren't similar, then there would be no need for a concurrent use application or consideration. But isn't the classic concurrent use situation for which the provision is designed one that essentially presumes that one user is quite local, and therefore it may be the identical mark in Maine versus California, but then the Maine business, nobody's going to get confused going into the shop with the same name in California just because somebody in Maine has it. So it's true that you would have a restaurant, same line of business, same name, but nevertheless you could establish no likelihood of confusion, even taking into account all of the DuPont analysis. I think that is the majority of cases in concurrent use, but it's by no means the sole situation in concurrent use proceedings. In fact, the In Re Batres Foods case involved major chunks of territory in the United States which were carved between the two parties there. You are into your rebuttal time, unless you have something further. We will hear from both of the other two parties. Good morning, Your Honors. I'm Debbie Squires, and I represent Emerald's Food of Love, one of the accepted users in this proceeding. I'm going to turn first to what Southwestern has essentially lost sight of in these proceedings, and I think that's what their burden was here, that in order to issue a concurrent use registration, it's very important that there's no likelihood of confusion. He's talked about that the marks and services DuPont shouldn't have applied because the marks and services are identical. Well, that's the exact problem with the concurrent use registration, and what the board is concerned about and should be concerned about is that consumers are going to be confused. Can I ask you, do you think that under this board decision or under your position that they could get a registration anywhere, or is Chef Emerald so famous everywhere that there would be a likelihood of confusion, essentially everywhere, maybe even including upstate New York? I think what came out of trial and what we knew before, but was certainly proven here, was that Chef Emerald and his restaurants, Delmonica Restaurants, he has two of them, are so famous across the United States that, no, you can't carve out a territory. And I understand that the board did get into some issues, or it had some discussion about its right to use the mark. Obviously, it's dicta. The board has no authority. Remind me, what were the specific pieces of evidence that prove the point you just made? Sure, of course. The first really objective evidence that we put in, and I think it's something that really makes this case unique from some of the prior concurrent use registration cases that dealt with hotels and restaurants. We put in objective evidence that showed that the customers at the Delmonica Restaurants, Emerald's Delmonica Restaurants, in Las Vegas and New Orleans, come from all over the country. We actually flew to Arizona, took the testimony of American Express, and put in reports showing exactly what percentages of customers dine, excuse me, what customers who charge with American Express cards at the Las Vegas location and the New Orleans location. So the theory is what they learn when they go to New Orleans or to Las Vegas is they take it back home, burnished in their memory? Yes, I'm sorry. I thought you meant take out food. Yes, no, that is correct. They do. They don't forget these restaurants. We put in evidence of sales. I mean, the one in Las Vegas is one of the highest grossing restaurants. Do you need a proof link to prove that second point? There are some people who probably go someplace and see something and they didn't really focus on the name. They were in Vegas to gamble. They were in New Orleans to drink during the music festival. They can't even remember the name of the restaurant they went in. So don't you need an element of proof to show that the people who, for your theory, the people who traveled home, you know, carried with them a matchbook or something, a memory of the fabulous meal that they connected the name? Right, or their credit card. There's no such evidence in this record, is there? All you have is that a lot of people traveled from all over the world to come to New Orleans or Las Vegas. No, not at all, Your Honor. We put in evidence of Chef Emeril as essentially a walking billboard. What was the piece of evidence that showed that? Of course. Emeril had a show called Emeril Live on the Food Network, and on that show at least six episodes specifically took place at the Delmonico restaurants, and they were called Delmonico. That was in the title. Those aired all over the country. We put in evidence of how many people saw them, and this is just the beginning. He went on his Sirius radio show. He talked about his Delmonico restaurants. He is regularly on Good Morning America, where he would, again, talk about it, a morning program. Other national shows, he wrote a book. I'm sorry, he wrote a book called Delmonico, a Restaurant with a Past. So if it was Good Morning America, your view would be that any area of the country that broadcasts that show would then, the knowledge of this mark goes there. So upstate New York, presumably they have a Good Morning America. Yes, and when he wrote this book, he actually went on a book tour with it. So that book tour took him all over the country, including New York. He went on the Home Shopping. That book was sold on the Home Shopping Network, an online service. The book was promoted in bookstores. Publications. We put in a huge volume. I guess that's more of a legal question because you understand the way that all of the trademark laws fit together better than I. It is a notable fact here that it's been almost 20 years since Chef Emeril opened the two restaurants and he hasn't, in fact, expanded, I guess. I guess, was there an attempt in Georgia or someplace that failed? No, there are two restaurants here. There are two restaurants. New Orleans and then Las Vegas.  the possibility that there is no current possibility of expansion into these other markets, that it's been a very, very long time. Is that irrelevant because as long as he keeps going on Good Morning America and people keep buying the books, diners in Syracuse are still going to be confused? That is true. I think that there is a distinction here between you had raised before the idea of a local establishment, which just serves customers in the area and people in California. If it's in New York, they're not going to be confused. These are very fact-specific cases. Wiener King was clear that you have to do an intense fact analysis. Outside the concurrent registration context, can you sue them for using the name in Syracuse and Utica and Rochester and Albany? What is at issue right now is- No, I know that's not at issue now, but if there's a likelihood of confusion, can you prevent them from using the name? I think before the board, the issue is the application is applied for, which is restaurant services, and then the second analysis before a court is a different one, and that's as to the mode or style of restaurant, et cetera. Let me try getting at the same question, or what I think is the same question. You have a currently pending application for an unrestricted registration for Delmonico's. Is that right? That's correct. Okay. If you succeed, I assume that's been stayed pending the outcome of this proceeding. That's correct. Let's say this case gets affirmed. Let's say that now you can proceed with your application. You probably are going to have to face an opposition, but even if you were to succeed all of that and then you get a registration, then what does that mean for the other two parties here in the court? Does that mean you would then have the right to prevent them from using the Delmonico mark, whether it's 56 Beaver Street or in Syracuse and Rochester? I think that is the result, Your Honor, because I think that finding, I mean, I guess the open question is whether B&B would find that, you know, whether you could take that as a precedent and use it in a federal court. That's an open question, but the answer is yes. If likelihood of confusion is found, then yes, you could go and you could stop them. But that hasn't happened yet. No, no. Because in your desire to obtain the sole registration, you have to show there's no likelihood of confusion? No, Your Honor. You'll be met with a claim that there will be a likelihood of confusion because there's been a holding in this case that there is. It's very confusing. This is true. But what is crystal clear is that there was a burden on the part of Southwestern. Southwestern, and the statute is clear, there's two prerequisites to getting a concurrent use registration. There's a jurisdictional one, which isn't really on a keel here. It's not disputed. The second one is that the statute itself speaks to that no confusion can arise if this concurrent use registration is issued. And that was a burden they had. There was no testimony put forth by Southwestern, no notice of reliance, essentially no evidence. In fact, the exact opposite happened. What happened when I asked Southwestern's officer, John Wade, Sr., who founded the company, I asked him, you know, how is it, are these two restaurants going to be confused? In your opinion, are Emerald's restaurants confusing with yours? And his response was no, because the styles of the restaurants are different. He said, and I also use Italian Steakhouse in my name. And it was a fundamental misunderstanding in this case of what was at issue before the board and what Southwestern had to prove. Southwestern didn't prove that the issue as to the style of restaurant was not before the board because he applied for a mark, Delmonico's, and the services are restaurants. Let's go back to my hypothetical. So my hypothetical was if this case were to be affirmed and then you go back and seek an unrestricted registration for the mark, Delmonico's, for restaurant services, how would that be able to be approved in the face of the fact that we have multiple users throughout the country that are using Delmonico's and therefore that is strong evidence that consumers, at least in those respective locales, would be confused by these multiple uses of Delmonico's for restaurant services? Your Honor, what is really at issue right now is one application. And I appreciate... I have a hypothetical. I know. You're predicting into the future, and I appreciate that that is, you know, top of the mind for you. But with respect to our unrestricted application, Beatrice Foods makes clear that the senior user, which is Emeril's, the senior user gets prima facie the entire United States except for any carved-out territories by junior users. So we, prima facie, are entitled to the entire United States. And whether, you know, that gives us the right to a national registration. But here at issue is an application by Southwestern. Ours, as the Board made clear, our application, which is behind, it has to clear several hurdles just to even get to that point, just to register. And we're not there yet. But just so I'm not that familiar with trademark law, just so I understand, if a junior user has, in fact, been using a mark in a particular location for 20 years or 100 years, but nevertheless they're junior to the applicant who is deemed to be the senior user, can the senior user really get an unrestricted registration that can thereby enjoin the 100-year junior user from continuing to use the mark in their specific location? Yes, theoretically they can. Yeah, I don't think that we want to put you in any type of a box. I mean, you've got a proceeding that's going to go forward at the Patent Office and you don't want to be met with some argument over there that you conceded something here. I understand that. So, Your Honors, if you have any other further questions, I think I might have run over my time and used up some of it. Thank you. May it please the Court, my name is Dick Downing. I represent an accepted user of CinemaLid. How do you say the word? Pardon? How do you say the word? Oh, CinemaLid. Delmonico's back. Delmonico's back. I'm not going to even try. You're not looking at CinemaLid? Well, I've worked in a variety of different places. This is New York Delmonico. This is the one in New York City. Yes, sir. Down on Wall Street, isn't that where it was? It's in the Wall Street area. It's on Beaver Street. Was it open in the early 60s? Do you remember? It's a long history and we don't claim a chain of title going back to the original restaurant. Our restaurant, the one we claim a chain of title going back to, was opened in 1998. I worked on Wall Street in the 60s. I think I ate there, so full disclosure, but it doesn't affect my judgment in any way. You very well might have. I'd like to start by focusing on the premise for this entire appeal, and that's that Beatrice Foods replaced the DuPont factors in concurrent use proceedings. That's clearly not the case. There's no support for that whatsoever. To the contrary, the Beatrice Food Court expressly said that the touchstone of any concurrent use proceeding is whether or not the registration sought will result in a likelihood of confusion. If you go back to the statute, which is section 2D of the Lanham Act, it says that a concurrent use registration will only be permitted when the conditions and limitations set forth in that application would avoid a likelihood of confusion. To repeat, the burden is on the appellant in this case to show that its registration, the registration it sought for Delmonico's for restaurant services, would not cause a likelihood of confusion. It clearly hasn't met that burden. Did Beatrice Foods say something like if Southwestern is the senior user here, then it's entitled to a prima facie finding that it gets a registration over the entire United States? I don't think it said that. I think it's very complicated. I'm not trying to say this is simplistic. Well, it said something like that, right? There are certain findings in Beatrice Food and in Wiener King and some of the other cases, but I can show you cases where the first file was not the party that won. I can show you cases. No, I'm not sorry. I'm sorry. I'm not talking about the first file. I'm talking about the senior user of the mark. That's correct. If they were to be deemed to be the senior user, the prior user, then they're entitled to some prima facie consideration that they're entitled to the mark. There may be certain presumptions that apply, but they're all rebuttable. I can show you cases. That's fine, but I just want to make sure that we have the same understanding of what Beatrice Foods said right there in that section of the opinion. I believe that's what it said. Okay. But again, the first to use is not always the winner. In many cases, it's not. The first to file is not always the winner. The first to register is not always the winner. This is a very, very complex case. Can I ask you to remind me, what did the board find about what's called priority dates for users as between you and the Emeril? Oh, similar to Emeril? Yes. The board found that Emeril had the priority date. That's because it basically reached back to the prior chain. That's correct. The board made that finding. We did not argue against that. We were not given the opportunity to submit a rebuttal brief on that. Is that going to have some forward-looking effect when they go for their national registration and try to stop you? It's a very complex proceeding. It's certainly something they will try and rely on. We think that we will have the opportunity to rebut that. One of the problems with this proceeding, and you mentioned it, generally concurrent use proceedings involve two companies, one of which is expanding or at least larger than one company, which is basically in a small area and doesn't have a reputation beyond a small enclave geographically. This is not that case. These are three companies, two of which have national reputations or very strong reputations, one of which, Southwestern, is a fine company, but it does not have a national reputation or any type of reputation beyond a rather limited area in upstate New York. There's no evidence of any publicity for Southwestern's Delmonico restaurants. There's no evidence of any public renown. Has the Orlando place opened yet? I know it hadn't. As of the close of testimony, it had not opened. Right, so that's why I asked the question. Tell me something outside the record. I think it probably has. I haven't seen it. You must have much more familiarity with these concurrent use cases than we do. It sounds to me like there are cases that are ripe for settlement between the parties. Sit down and agree and say, you know something, I'll use my mark here and you use your mark over there and we won't sue each other. Concurrent use cases are very rare. I've only had two and that may be two more. That's two more than I've had. Two more than maybe other attorneys have had. They're very rare. They can be very complicated. They do lend themselves to settlement in certain cases and the conditions and limitations are not always geographical. They could be the manner in which the mark is displayed or used or even the type of goods or services offered under the mark. But this is a very complex situation. It does not lend itself to the simplistic type of rote analysis that Southwestern has offered here. This is unlike any case involving restaurants or hotels that I'm familiar with. And I think that the board was correct in finding that given the conditions and limitations in the application that Southwestern seeks, it would not avoid a likelihood of confusion. And Southwestern really doesn't make that argument. Do you think the world that we're living in today, as opposed to the world that Judge Baldwin was living in in Beatrice Foods, makes any difference for all this analysis? Social media is what I'm thinking about in particular. Your colleague, on your side of the fence here at least, was alerting to TV and all the rest of the way that information is circulated. I think that the Internet certainly has changed things in that regard and I think the case law does say that a certain amount of overlap is permissible, certainly Southwestern cited those cases. But in this particular case, I think that going back to conditions and limitations that are in this application, they're purely geographical and they're purely way far too confining to avoid a likelihood of confusion. Sorry, that's my timer. It's my personal timer. I'm sorry, I was using an iPhone at the time. I wasn't sure that I'd have a timer here. Well, if you have nothing else, I don't think we have any further questions. Thank you. My adversaries have commented about the fame of their trademarks. Let it be clear, the Trademark Criminal Appeal Board found there was no fame to no degree anywhere by either of their trademarks. What they did was say something, well, there's got some reputation through a substantial portion of the United States for each of them. There's no case law talking about what does reputation mean? My adversaries have not commented on any case law to support a finding of reputation, what that means, and how it can be injected into a likelihood of confusion analysis. Why isn't that just a colloquial way of talking about the reason that there will be confusion? Lots and lots of consumers know about this and so they will be confused in some significant numbers when you had the mark everywhere except Las Vegas and New Orleans and I guess a piece of New York City. Is that defining that lots and lots of people, because I'm not sure what reputation means, lots and lots of people or some people? Enough that there would be a likelihood of confusion. Then I think that Southwestern would challenge that determination by the TTAB. There's been evidence of some dispersion of the trademarks in all concurrent use proceedings, the Holiday Inn case, Winter King case, all involving restaurants and hotels. Customers come from everywhere in these concurrent use cases and the advertising overlaps. Holiday Inn was making national advertisements and so forth. The case law said, well, we understand that in the context of restaurants and hotels, people come from all over the country. You get a hotel in Arizona, people come from all over down there in the wintertime to go at that hotel. Just to get to the underlying point of the question, it seems entirely appropriate for the board to try to inquire what is the relative territorial reach of each of these brands in terms of understanding whether there would be a likelihood of confusion. So in terms of trying to understand what's the relative reputation of a mark and what's the reach of that reputation, that just logically seems like a natural inquiry one would want to make. Are you resisting whether the board was correct as a legal matter from even making that kind of fact finding? It's logical to make that analysis, Your Honor. Yes. But here there's no consumer awareness surveys. There was no indication of the numbers of the relevant population to be considered in connection with Arkansas or Minnesota or wherever and how much there was a saturation of those customers by either a similar or emeralds. And strangely enough, each of them contend that they have a nationwide reputation. So when somebody in Utah thinks of Delmonico's or Delmonico, a similar says, well, they think of us in New York City. Emerald says, no, they think of us in New Orleans or Las Vegas. How can that be? How can somebody sitting in Utah hear the term Delmonico's or Delmonico restaurant and simultaneously think New York, no, no, no, Las Vegas. So it can't be. It cannot possibly be that this overlapping reputation has such a degree of saturation as to be significant. And the underlying evidence is lacking for the determination made by the trademark trial and peer board that there's this reputation in some sort of substantial portion of the United States. Also looking forward, a lot of the reputations put it that way, was based upon Emerald Legassi and his TV show and so forth and some of the advertisements or promotional things done there and his book and so forth. Well, looking forward, we're talking about likely confusion of the registrations going forward, Emerald Legassi is a has-been. He's going to die. And there's no evidence of record indicating that his TV shows would continue or have continued or anything like that. So that's past. What's going to happen going forward? And your time is up. Can you just wrap up very quickly, please? With regard to the likely confusion analysis, the Bakery Foods case itself involved the exact same trademarks, Judge Chen, Homestead. One party used it for dairy products. The other party used it for oil and margarine. If they used the plant factors likely confusion analysis, they would never have had a concurrent use registration dividing up the United States. So they could not have used the analysis in connection with that case as well as the other concurrent cases. Thank you. Thank you very much. Case is submitted.